IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ERIN JENKINS                                                                    PLAINTIFF

V.                                          NO. 14-5339

CAROLYN COLVIN,
Acting Commissioner of the Social Security Administration               DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Erin Jenkins, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. §405(g).

I.      **Procedural Background:**

Plaintiff filed her current application for DIB on February 28, 2012, alleging an inability to work since October 28, 2011, due to depression and anxiety. (Tr. 66, 149-50, 170, 174).  An administrative hearing was held on July 2, 2013, at which Plaintiff appeared with counsel and testified. (Tr. 25-65).

By written decision dated August 13, 2013, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe – sacroiliitis and depression. (Tr. 13).  However, after reviewing all of the evidence presented, the ALJ  determined that Plaintiff's impairments did not meet or equal the level of severity of

1

any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 13). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> Perform medium work as defined in 20 CFR 404.1567(c) except that the claimant can perform simple, routine, and repetitive tasks in a setting where interpersonal contact  is incidental to the work performed and can work under supervision that is simple, direct, and concrete.

(Tr. 15). With the help of the vocational expert (VE),  the ALJ determined that during the relevant time period, Plaintiff could not perform her past relevant work, but would be able to perform such jobs as hand packer, machine packer, and industrial cleaner. (Tr. 19).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on September 29, 2014. (Tr. 1-3). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed briefs and the case is before the undersigned for report and recommendation. (Docs. 8, 9).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

Plaintiff was born in 1971 and served in the Army National Guard for approximately ten years (1992-2002), and did not see combat, but suffered extensive injuries in a motor vehicle accident which occurred in 1998.   (Tr. 576). Plaintiff has been diagnosed with Rendu-Osler-Weber syndrome,[1] and on October 22, 2008, a cauterization of her nose was performed.  In December of 2008, Plaintiff was doing well. (Tr. 768, 771).

---

[1] Rendu-Osler-Weber syndrome – syn hereditary hemorrhagic telangiectasia.
  Hereditary Hemorrhagic telangiectasia – a disease with onset usually after puberty, marked by multiple small telangiectases and dilated venules that develop slowly on the skin and mucous membranes; the face, lips, tongue, nasopharynx, and intestinal mucosa are frequent sites, and recurrent bleeding may occur; autosomal

Plaintiff began seeing Dr. Robin Ross, who, on September 17, 2010, prepared a letter stating that Plaintiff was under her medical care for a diagnosis of Depressive Disorder NOS, Anxiety Disorder NOS, and Attention Deficit Hyperactivity Disorder, unknown type.  (Tr. 868).   Dr. Ross reported that this disorder prevented Plaintiff from successfully working more than ten hours a day, and prevented her from working more than fifty hours a week. (Tr. 868).  She further reported that the condition was expected to last a lifetime, and that Plaintiff was able to complete all essential functions of her job other than the time limitations given above.  (Tr. 868).   On October 21, 2010, Dr. Ross assessed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Depressive Disorder NOS |
| | Anxiety Disorder NOS |
| | Attention Deficit Hyperactivity Disorder, unknown type |
| Axis II: | No diagnosis |
| Axis III: | Telangiectasia |
| Axis IV: | Chronic, moderate |
| Axis V: | GAF – 75 |

(Tr. 202).

On February 11, 2011, Plaintiff was referred to the Veterans Administration (VA) for evaluation of a mental disorder. (Tr. 264).  Plaintiff reported problems with depression, poor concentration, lack of energy, excessive anger and irritation, guilt, fears, nervousness, panic, and an inability to relax. (Tr. 264).  Plaintiff was reportedly able to walk to the office and sit for the interview without apparent difficulty, and her overall mood seemed depressed and anxious. (Tr. 265).  Plaintiff was in need of medication and counseling, and was diagnosed as follows:

| | |
|---|---|
| Axis I: | Adjustment disorder with depressed mood |
| Axis II: | No diagnosis |
| Axis III: | Joint pain, weight loss |
| Axis IV: | Occupational |

---

dominant inheritance, caused by mutation in the gene (ENG) encoding endoglin on chromosome 9q. SYN Rendu-Osler-Weber syndrome. Stedman's Medical Dictionary 1911, 1941 (28th ed. 2006).

Axis V:       52, due to low social tolerance, no friends, tending to lash out at work. (Tr. 265).

Plaintiff underwent several x-rays in February 18, 2011, and no acute findings were found in the cervical spine, right hand, and pelvis. (Tr. 251, 267, 248). X-rays of Plaintiff's knee revealed possible residue from previous trauma with either a bony exostosis arising from the lateral condyle versus soft tissue calcification. (Tr. 249).

On May 13, 2011, Plaintiff presented herself to Dr. Ross and advised she was in therapy with Dr. Marie Wood. (Tr. 203).

On June 9, 2011, Plaintiff presented to Washington Regional Medical Center for evaluation of head injury associated with alcohol use. (Tr. 210). A CT of Plaintiff's head was negative, and she was diagnosed with head contusion and concussion. (Tr. 211). Plaintiff admitted to drinking margaritas that day. (Tr. 213). On June 17, 2011, Plaintiff reported to Dr. Ross that she was "much better." (Tr. 204).

On July 11, 2011, Plaintiff presented to the VA emergency room, complaining of elbow pain. (Tr. 307). It was reported that Plaintiff had mild deformity of the left elbow, but Plaintiff had full range of motion without clicking, popping, or acute pain. (Tr. 309). Plaintiff was diagnosed with traumatic arthropathy, and was prescribed an elbow brace and naproxen tab. (Tr. 309).

In a report summarizing a genitourinary examination dated September 9, 2011, it was reported that Plaintiff was suffering from frequent toileting every hour or less and had decreased dexterity of the right hand. (Tr. 242-243).

Plaintiff reported to Dr. Ross on September 16, 2011, that she was "doing well" and that her medications were ok. (Tr. 204).

4

On January 12, 2012, a rating decision was given by the VA, in pertinent part, as follows:

1.  Evaluation of adjustment disorder with depressed mood (claimed as depression), which is currently 10 percent disabling, is increased to 50 percent effective October 8, 2010.

2.  Evaluation of stress and urge incontinence, which is currently 0 percent disabling, is increased to 20 percent effective October 8, 2010.

3.  Evaluation of traumatic brain injury with history of cerebral concussion with residual posttraumatic chronic muscle tension type headaches, which is currently 10 percent disabling, is continued.

(Tr. 217).

On January 26, 2012, it was reported that Plaintiff had normal strength in shoulder abduction and flexion in her previously injured shoulder, and that discomfort would limit how she accomplished activities involving lifting overhead or pushing. (Tr. 235-239).

On March 16, 2012, Plaintiff reported to Dr. Ross that she was fired from her employment because she kept making mistakes. (Tr. 204).

On April 9, 2012, Plaintiff reported to the VA that she smoked tobacco once in a while and drank one to two beers twice a week. (Tr. 285).  On April 18, 2012, the VA gave the following diagnosis:

| Axis I; | Anxiety disorders; Cognitive disorders; impulse control disorders, not elsewhere classified; eating for comfort; mood disorders; sleep disorders; legs are restless; trouble going and staying asleep |
| Axis II: | Deferred |
| Axis III: | Musculoskeletal and connective tissue; blood and blood forming organs; anemia |
| Axis IV: | Financial; bereavement; legal; occupation; unemployment; chronic pain |
| Axis V: | GAF – 51 |

(Tr. 486-487).

5

On April 18, 2012, Plaintiff met with Danna M. Ray, APN, at the VA. (Tr. 273). The assessment was the same as above, and it was further noted that Plaintiff reported she used cannabis daily. (Tr. 279).

On May 2, 2012, Marie W. Wood, Ph.D., Clinical Psychologist, wrote a letter wherein she stated that Plaintiff had her initial appointment on March 29, 2011, and was treated by Dr. Wood until November 30, 2011. (Tr. 336). Dr. Wood stated that Plaintiff was diagnosed with major depression, recurrent, severe, and generalized anxiety disorder with panic attacks and agoraphobia. She opined that Plaintiff did not have the mental stamina to be employed and that was unlikely to change. (Tr. 336).

In May of 2012, Plaintiff was seen at the VA for an injury to her left thumb (Tr. 478) and eye consult (Tr. 377), and underwent neuropsychological testing on May 25, 2012. (Tr. 370). Dr. Robert Stilwell assessed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Major Depression, recurring – chronic<br>Chronic adjustment disorder<br>Brain syndrome |
| Axis II; | None |
| Axis III: | Chronic fatigue syndrome; lumbosacral or cervical strain; thigh condition; limited extension of thigh; upper arm condition; limited flexion of forearm; limitation on motion, ring or little finger; scars; superficial scars; chronic cystitis; and hereditary hemorrhagic telangiectasia |
| Axis IV: | mild |
| Axis V: | gaf – 55 |

(Tr. 468-469).

On June 5, 2012, Plaintiff was diagnosed with mild hallux valgus deformity with mild degenerative changes of the first MRP joint. (Tr. 337). On July 5, 2012, Plaintiff was seen at the VA by Kimberly Carney, APN, and requested a TENS unit for her lower back. (Tr. 447). She also complained of increasing teeth grinding at night, tiredness, urinary incontinence,

right foot bunion, and numbness to bilateral hands. (Tr. 447).  Plaintiff was assessed with TMJ joint narrowing on the right and sacroiliitis. (Tr. 338-367).

On July 11, 2012, Plaintiff advised Dr. Moravits that she needed to "get control over my anger and improve my focus, attention and concentration" and needed help with medication management. (Tr. 439).  She reported that she liked working on cars, fixing things, and carpentry. (Tr. 440).  She reported that on average, she drank about one beer per week and used marijuana on a daily basis (smoked one or two bowls per day). (Tr. 440).  "I probably smoke ½ ounce every month." (Tr. 440).  Dr. Moravits diagnosed Plaintiff as follows at that time:

| | |
|---|---|
| Axis I: | Impulse-Control Disorder NOS |
| | Partner Relational Problem |
| Axis II: | Diagnosis Deferred on Axis II |
| Axis III: | See SPRS problem list |
| Axis IV: | Psychosocial Stressors: severe – conflict with life partner |
| Axis V: | GAF, current 70 |

(Tr. 442).  Dr. Moravits saw Plaintiff again on July 25, 2012, and gave the same diagnosis, reporting that a lot of Plaintiff's depression was a result of unmet emotional needs and indecision about life goals. (Tr. 436-437).  It was also reported by Dr. Robert Stilwell that Plaintiff declined mood stabilizers/antidepressants. (Tr. 439).  On July 27, 2012, Plaintiff was referred to physical therapy for instructions on the proper use of the TENS unit. (Tr. 368).

On August 14, 2012, a Mental Diagnostic Evaluation was performed by Terry Efird, Ph.D.  (Tr. 575-579).  At that time, Plaintiff reported she was continuing to be seen weekly through the VA for mental health services, and was prescribed lithium and Lorazepam through the VA.  Medications were reportedly taken as prescribed and side effects were denied. (Tr. 576).  The ability to perform basic self-care tasks independently was endorsed, and the ability to perform household chores adequately was described as impaired by feeling

7

frustrated about beginning tasks. (Tr. 576).  The use of alcohol was described as rare (about a six pack of beer per month), and the use of illegal substances was denied. (Tr. 576).  Dr. Efird diagnosed Plaintiff as follows:

Axis I:       Depressive disorder NOS; anxiety disorder NOS
Axis II:      Deferred
Axis V:      50-60

(Tr. 578).  Dr. Efird reported that the ability to shop independently was endorsed by Plaintiff; and the ability to perform activities of daily living adequately was described as impaired by difficulty beginning tasks. (Tr. 578).  Dr. Efird also found that Plaintiff communicated and interacted in a reasonably socially adequate and intelligible and effective manner; had the capacity to perform basic cognitive tasks required for basic work like activities; appeared able to track and respond adequately for the purposes of the evaluation; and appeared to be capable of performing basic work like tasks within a reasonable time frame. (Tr. 578).

On August 16, 2012, non-examining consultant Jon Etienne Mourot, Ph.D., completed a Psychiatric Review Technique form, and found that Plaintiff had a mild degree of limitation in activities of daily living and in maintaining social functioning, and had a moderate degree of limitation in maintaining concentration, persistence, or pace, and had no episodes of decompensation, each of extended duration. (Tr. 591).  Dr. Mourot also completed a Mental RFC Assessment form, and found that it appeared Plaintiff was able to perform work where interpersonal contact was routine but superficial; where complexity of tasks was learned by experience; tasks had several variables and required judgment within limits; and supervision required was little for routine, but detailed for non-routine tasks. (Semiskilled). (Tr. 597).

On September 5, 2012, Plaintiff met with Dr. Moravits and reported that she thought "things may be a little better." (Tr. 403). Dr. Moravits gave her a GAF score of 50 (Tr. 405). On September 12, 2012, Plaintiff saw Dr. Stilwell, who prescribed an antidepressant. (Tr. 395). Dr. Stilwell reported that Plaintiff denied the use of tobacco and rarely drank. (Tr. 400). He gave her a GAF score of 55. (Tr. 402). Dr. Stilwell also recommended aerobic exercise. (Tr. 403).

On September 19, 2012, Plaintiff reported to the VA that she felt better about what was going on at home and that she had interviewed for two part-time jobs. (Tr. 393). She reported that things were "pretty good." (Tr. 393). On October 5, 2012, Plaintiff reported low back pain and incontinence. (Tr. 388).

On October 17, 2012, Plaintiff told Dr. Moravits that she was "doing pretty good." (Tr. 385). On November 7, 2012, Plaintiff reported to Dr. Moravits that she had been "working on my house which is now rental property." (Tr. 636). "I have redone the floors and done some painting." (Tr. 636). Dr. Moravits gave Plaintiff a GAF score of 55. (Tr. 636). She repeated this again to Dr. Moravits on November 14, 2012. (Tr. 628).

On November 28, 2012, in a Case Analysis report, non-examining consultant Abesie Kelly, Ph.D., opined that she had reviewed all the evidence in the file and affirmed the assessment of August 16, 2012. (Tr. 599).

On November 28, 2012, Plaintiff reported to Dr. Moravits that her renter found fleas in the house so he moved out and in the process, her new floors were damaged. (Tr. 625). "I may have to redo all my hard work. " (Tr. 625).

On November 29, 2012, non-examining consultant, Dr. Sharon Keith, completed a Physical RFC Assessment form. (Tr. 600).  Dr. Keith opined that Plaintiff could perform medium work. (Tr. 6000-607).

On December 5, 2012, Plaintiff reported to Dr. Moravits that she was doing okay but was frustrated because she had been denied twice by the social security system. (Tr. 623). On December 12, 2012, Plaintiff told Dr. Moravits that she was "doing pretty good" and that the medicine she was on "seems to be helping so I'll leave it alone." (Tr. 614).  The only problem was her weight gain. (Tr. 614).

On December 19, 2012, Plaintiff told Dr. Moravits that she thought she was doing "pretty good" and that she had been busy with the house she and her partner were buying. (Tr. 612).  On December 28, 2012, James Fuendeling, Ph.D., Neuropsychologist, reported that Plaintiff ambulated independently and showed no remarkable motor signs.  Her speech was fluent, well-articulated, and reflected logical, goal directed underlying thought. (Tr. 836).  He gave her a diagnosis of amnestic disorder due to TBI and a GAF score of 50. (Tr. 838).

On January 23, 2013, Plaintiff advised Dr. Moravits that her partner did not want her to take the only car to Indiana to see some of Plaintiff's friends, which upset her. (Tr. 820). On January 25, 2013, Plaintiff reported to the VA that she still had back pain, but had not had to increase the use of pain medicines. (Tr. 811).  On January 30, 2013, Plaintiff told Dr. Moravits that she was "doing pretty good actually. I want to lose some weight." (Tr. 803). On February 13, 2013, Plaintiff again told Dr. Moravits she thought she was "doing okay." (Tr. 798).

10

At Plaintiff's request, on February 3, 2013, Dr. Wood wrote a letter, again stating that she saw Plaintiff between March 29, 2011, and November 30, 2011, and that Plaintiff did not have the mental stamina to be employed and that was unlikely to change. (Tr. 777).

X-rays of Plaintiff's lumbosacral spine, dated February 7, 2013, revealed a stable pelvis with healed fractures. (Tr. 855).

On February 26, 2013, Plaintiff met with Dr. Fuendeling for feedback on her December neuropsychological assessment. (Tr. 796). Dr. Fuendeling believed Plaintiff would be a good candidate for some cognitive rehab and training in mnemonic strategies. (Tr. 796).

On February 27, 2013, Plaintiff told Dr. Moravits that except for her back, which often hurt, "I'm doing okay I think." (Tr. 793). On March 12, 2013, Plaintiff reported that her daily responsibilities included household chores for their home as well as a rent house. (TRT. 790). She reported chronic back pain for which she required pain medication. (Tr. 790).

## III.  Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. <u>Ramirez v. Barnhart</u>, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. <u>Edwards v. Barnhart</u>, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary

outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the

Plaintiff's age, education, and work experience in light of her RFC.   See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**IV.    Discussion:**

Plaintiff raises the following issues in this matter:  1)  Whether the ALJ erred when he found Plaintiff did not meet a listing for mental disorders; 2) Whether the ALJ erred in his determination of severe impairments; 3) Whether the ALJ erred in his credibility analysis; and 4) Whether the ALJ erred in his RFC determination. (Doc. 8).

**A.     Severe Impairments:**

Plaintiff argues that the ALJ failed to find that her need to void at least every hour during the day and Hereditary Hemorrhagic Telangiectasia were severe impairments. An impairment is severe within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 1520(a)(4)ii, 416.920(a)(4)(ii).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § § 404.1521, 416.921.  The Supreme Court has adopted a "de minimis standard" with regard to the severity standard.  Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cri. 1989).

The record reflects that prior to Plaintiff's onset date, on September 22, 2008, Plaintiff reported a long history of nosebleeds due to Rendu-Osler-Weber syndrome. (Tr. 764).  Plaintiff underwent an endoscopic cauterization of her nose by Dr. James Ragland, and on October 22, 2008, she reported she had no further nosebleeds and was overall doing well. (Tr. 768).  Plaintiff reported to Dr. Ragland on December 2, 2008, that she had done fairly

well since the cauterization, but had not been able to maintain good saline moisturizing of her nose. (Tr. 771). Dr. Ragland reported that her nose looked good and wanted her to keep things moist with Ayr gel at night and saline sprays frequently throughout the day. (Tr. 771). He wanted her to come back if she had any further problems or bleeding. There are no subsequent records indicating Plaintiff returned to see Dr. Ragland. In addition, a review of the remaining records reveals that although Plaintiff continued to be diagnosed with the syndrome, there were no significant complaints of nosebleeds during the relevant time period. The Court recognizes that Plaintiff testified at the hearing that she had nose bleeds frequently – "almost every day." (Tr. 39). However, she also testified that the cauterization did not work, and as indicated above, the 2008 medical records indicate otherwise. As will be more fully addressed below, Plaintiff's credibility is at issue as well.

In addition, with respect to Plaintiff's nosebleeds and need to urinate frequently, Plaintiff suffered from these impairments for many years, and they did not prevent her from performing substantial gainful activity until October 28, 2011.

The Court believes there is substantial evidence to support the ALJ's decision relating to severe impairments.

**B.** **Failure to Meet a Listing:**

Plaintiff argues that Plaintiff's depression met a listing under Listing 12.04. "The claimant has the burden of proving that his impairment meets or equals a listing." Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). "To meet a listing, an impairment must meet all of the listing's specified criteria." Id. "To establish equivalency, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" Carlson v. Astrue, 604 F.3d 589, 594 (8th Cir. 2010), quoting from Sullivan v.

Zebley, 493 U.S. 521, 531 (1990).  "[W]hen determining medical equivalency, an impairment can be considered alone or in combination with other impairments."  Carlson, 604 F.3d at 595.

Listing 12.04C provides:

Medically documented history of a chronic affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.04C.

In his decision, the ALJ concluded that Plaintiff did not have a medically documented history of a mood disorder of at least two years' duration and with symptoms or signs currently attenuated by medication or psychosocial support, which has caused more than a minimal limitation of the ability to do basic work activities. (Tr. 15). He also concluded that the records did not reveal factors which satisfied the criteria set forth in paragraphs 1, 2, or 3 above. (Tr. 15).

Plaintiff argues she met the two year duration requirement and the provision relating to repeated episodes of decompensation "since she was fired from her jobs at Zero Mountain in 2011." (Doc. 8 at p. 10).  Even if the Court agreed with Plaintiff on the two year duration requirement, Plaintiff has failed to establish she satisfied any of the remaining requirements

of paragraph C.  The listings delineate impairments considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §404.1525(a).  The record before the Court establishes that during the relevant time period, Plaintiff's daily activities were significant. In fact, as indicated earlier, Plaintiff reported on September 19, 2012, that she had applied for two part-time jobs (Tr. 393), and participated in renovating a rental house and did household chores during the relevant time period.  Plaintiff failed to present sufficient evidence to support the remaining criteria listed in 12.04C.

Based upon the foregoing, the Court finds there is substantial evidence to support the ALJ's findings that Plaintiff's severe impairments did not meet or medically equal a listing.

**C.     Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

Plaintiff argues that the ALJ used unreasonable and arbitrary findings about Plaintiff's credibility.  In his decision, the ALJ found that although he had no doubt that

16

Plaintiff experienced some discomfort, her allegations of limitations and pain level were inconsistent with the objective medical evidence. (Tr. 17). He found that based upon the absence of more aggressive treatment, medical opinions, and the evidence as a whole, Plaintiff's allegations were not fully credible. (Tr. 17).  The ALJ noted several factors which contributed to his credibility determination.  (Tr. 17).  The Court finds it noteworthy that Plaintiff denied the use of illegal substances during her examination with Dr. Efird, but admitted on more than one occasion that she smoked cannabis daily and drank on occasion. (Tr. 60, 279, 285, 440, 576).  In addition, although Plaintiff alleged limited daily activities, the record reflects that she was able to work on her rental house, clean house, do laundry, plan a trip to Indiana to see friends, go to the grocery store, drive, water the garden, and paint.   These  activities  are  not  consistent  with  disabling  pain.   In  addition,  Plaintiff consistently reported to the VA in December of 2012 that she was doing "pretty good" and that the medicine she was taking seemed to be helping. (Tr. 612. 614).

Based upon the foregoing, the Court believes there is substantial evidence to support the ALJ's credibility analysis.

**D.    RFC Determination**:

Plaintiff argues that the ALJ erred in selecting the medical opinions of two non-examining state consultants rather that the treating doctors.  RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).    Limitations  resulting  from  symptoms  such  as  pain  are  also  factored  into  the

assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id. "The ALJ is permitted to base its RFC determination on 'a non-examining physician's opinion *and* other medical evidence in the record.'" Barrows v. Colvin, No. C 13-4087-MWB, 2015 WL 1510159 at *15 (quoting from Willms v. Colvin, Civil No. 12-2871, 2013 WL 6230346 (D. Minn. Dec. 2, 20    13).

With respect to weight given to the opinions of treating physicians, "[a] claimant's treating physician's opinion will generally be given controlling weight, but it must be supported by medically acceptable clinical and diagnostic techniques, and must be consistent with other substantial evidence in the record." Andrews v. Colvin, No. 14-3012, 2015 WL 4032122 at *3 (8th Cir. July 2, 2015)(citing Cline v. Colvin, 771 F.3d 1098, 1102 (8th Cir. 2014). "A treating physician's opinion may be discounted or entirely disregarded 'where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" Id. "In either case-whether granting a treating physician's opinion substantial or little weight-the Commissioner or the ALJ must give good reasons for the weight apportioned." Id

In his decision, the ALJ gave great weight to the opinion of non-examining consultant, Dr. Sharon Keith, who opined that Plaintiff could perform medium work. (Tr.

18).  He gave significant weight to the opinion of non-examining consultant, Jon Etienne Mourot, Ph.D., regarding Plaintiff's mental limitations, although the ALJ reduced her "semi-skilled" rating to "unskilled" in the RFC, based upon recent medical evidence. He also gave the opinion of non-examining consultant, Abesie Kelly, Ph.D., significant weight. (Tr. 16). The ALJ gave great weight to the opinion of Dr. Efird, who examined Plaintiff and opined she had the capacity to perform basic cognitive tasks required for basic work-like activities and was capable of performing basic work-like tasks within a reasonable time frame. (Tr. 18).

The ALJ gave little weight to the opinions of Dr. Wood, and to Dr. Ross, because Dr. Wood saw Plaintiff between March 2011 to November 2011, and the ALJ found her opinion that Plaintiff did not have the mental stamina to be employed was unsupported by any medical records and was inconsistent with the objective evidence. (Tr. 18).  Dr. Ross's belief that the accommodation of limited hours of work was medically necessary was not, in the ALJ's opinion, supported by the objective medical evidence.  (Tr. 18).  The single record from Dr. Ross that is from the relevant time period supports the ALJ's decision. (Tr. 204-205).  Plaintiff last saw Dr. Wood on November 30, 2011, only approximately one month after Plaintiff's alleged onset date of October 28, 2011. Furthermore, the ultimate resolution of the issue of an individual's disability status is reserved to the Commissioner.

The ALJ discussed all of the relevant medical records, all of the medical opinions, and Plaintiff's allegations, and gave sufficient reasons for discounting the opinions of the treating physicians.  The Court believes that there is substantial evidence to support the ALJ's RFC determination and weight he gave to the opinions of the various physicians.

     **E.**     **Hypothetical Question Posed to the VE:**

The ALJ posed the following hypothetical question to the VE:

Q:  I'd like you to assume a hypothetical person, younger individual, high school education. First this person cannot return to any past relevant work and there are no transferable skills.  Physically the person can do medium work as defined by 20 CFR 404.1564 and 416.964. Medium work.  In addition, the person is otherwise limited in the following manner:  the person can perform simple, routine, repetitive tasks in a setting where interpersonal contact is incidental to the work performed; the person can work under supervision that is simple, direct and concrete.  Any my question is would there be work in the economy this person could do?

A:  Yes, Your Honor…An example would be a hand packer….there would be a machine packer….there would be an industrial cleaner, particularly a janitor….

(Tr. 63).

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing the jobs of hand packer, machine packer, and industrial cleaner (janitor). Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**V.     Conclusion:**

Accordingly, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right**

20

to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 21st day of October, 2015.


s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE